Filed 6/26/24  P. v. Fischer CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082211 |
| v. | (Super.Ct.No. SWF2100267) |
| BILLY JOHN FISCHER II, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven G. Counelis, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, defendant and appellant Billy John Fischer II was convicted of carjacking (Pen. Code,[1] § 215, subd. (a)) and second degree robbery (§ 211).  The trial court sentenced him to state prison for five years.  He appeals contending the evidence is insufficient to support his convictions, and the court erred in failing to hold a hearing on his motion to substitute counsel and in selecting the midterm sentence.  We reject his contentions and affirm.

## I.  PROCEDURAL BACKGROUND AND FACTS

On February 16, 2021, around 6:30 p.m., Umair Ahmed went to Courtney Black's (defendant's live-in girlfriend) home in his 2021 Jeep Compass to loan her $50.  Black said she had to give the money to someone and told Ahmed to wait a block away.  About 20 to 25 minutes later, a white SUV parked behind him.  Black walked up to Ahmed's vehicle, opened the passenger door, and "two- to three-second[s]" later, a white male with both a tattoo[2] and acne scarring on his face (later identified as defendant) opened the driver's side door.  The man put a gun[3] to Ahmed's head, demanded money, and said, "Motherfucker, I'm gonna shoot you."  Ahmed handed over $30 and his cell phone.

There was another male (later identified as J Dub or J Dubb, aka James Wilson) present.  The two asked for more money, but Ahmed showed them that was all he had in

---

[1]  Further unspecified statutory references are to the Penal Code.

[2]  When interviewed by the investigating deputy, Ahmed indicated the tattoo was on the right side of the male's face, forehead, or temple area.

[3]  Ahmed assumed it was a gun because the man said he was "gonna shoot" him.

2

his wallet. One of the males punched Ahmed in the face.[4] After ordering him out of the Jeep, defendant got in the driver's seat, Black got in the passenger seat, and they drove away. The white SUV left in the same direction.

After 911 was called, police responded. Ahmed conveyed what had happened; although he did not get a good look at the man with the gun, he described him as a White male, 5 feet 11 inches to six feet tall, medium build, mid-30's, acne scarring, a tattoo on his face, and wearing a white hoodie.[5] When asked if he was 100 percent sure the perpetrator had a tattoo on the right side of his face, Ahmed replied, "'No, not 100 percent.'" He was unable to identify defendant from a six-pack lineup containing his photo or at the preliminary hearing; however, Ahmed positively identified Black.

Less than a half-hour after Ahmed was carjacked and robbed, surveillance video at an In-N-Out and CVS in Temecula recorded defendant, Black, and J Dub together with a black backpack, an orange shoebox, and two-toned football gloves. The In-N-Out is 10 to 15 miles from the incident, and 10 to 20 minutes away. The next day, the Jeep was located near the scene of the crimes. Ahmed's black backpack, football cleats inside an orange Nike shoebox, and black-and-white football gloves were missing.

Black was arrested. After waiving her *Miranda*[6] rights, she told police she met with Ahmed to borrow $50. She claimed that he forcibly grabbed her breasts. In

---

[4] In his interview, Ahmed said the second male hit him in the face.

[5] Defendant is 5 feet 11 inches tall and has tattoos on his face.

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

response, she socked him in the face and drove off in his car to get away from him; she returned the car the next day. Initially, Black declared that she alone took Ahmed's Jeep; however, she later admitted that she had help from defendant, J Dub, and another guy in a White SUV. She explained that defendant was mad that Ahmed had grabbed her breasts, so he came up with the idea of taking the Jeep. After Ahmed unlocked the car doors for her, defendant opened the driver's door, demanded money, and, using a gun, said, "[G]et the fuck out of the car." Black did not know if the gun was real. Defendant took $30 and the Jeep; he drove away with Black in the passenger's seat, and J Dub in the back. The third man remained in the SUV. On the night these crimes were committed, Black was dating defendant and was on methamphetamine, maybe fentanyl or "roxies." She later pled guilty to robbery; however, at trial, she testified that she did not recall anything about the events of that night.

Defendant waived his *Miranda* rights and was interviewed by the investigating officers. Initially, he denied any involvement in the carjacking; he claimed that he was home sick, and Black took the Jeep after Ahmed touched her inappropriately. Later, he admitted being present when Black, J Dub (a Black male who was armed with a gun), and Little Billy (wearing a light-colored sweatshirt) ran up to a dark colored vehicle and carjacked the victim. Defendant said that he had stolen a "light" colored SUV to get to Black, J Dub, and Little Billy, and Black ran to the passenger side (as J Dub and Little Billy approached the driver's door) and hit the driver. He claimed that J Dub pointed a gun at him (defendant) and told him to leave and "not . . . say nothin'." Defendant left,

4

returned the stolen SUV, and then Black and J Dub picked him up in the stolen Jeep. They drove to an In-N-Out in Wildomar or Temecula, and then to CVS. According to defendant, J Dub took Ahmed's gloves and Little Billy took Ahmed's backpack. He described Little Billy as a White man with a tattoo and scar on his cheek. Defendant asserted he was a heroin addict, was on drugs, and could not remember much about the events of that night.

An investigator received video surveillance footage from In-N-Out and CVS in Temecula from the evening of February 16, 2021. The investigator identified defendant, Black, and J Dub on the CVS video between 7:52 p.m. and 7:57 p.m. Defendant was carrying a black and yellow duffel bag and a black backpack on his shoulders. J Dub was wearing black shoes with a white sole and two-toned gloves, and he carried an orange shoe box under his arm.

Cell phone records from February 16, 2021, revealed several incoming and outgoing phone calls between Black and Ahmed, as well as communications between Black and defendant, Black and J Dub, and defendant and J Dub. There were five interactions between Ahmed's phone and Black's phone between 6:28 p.m. and 7:03 p.m. These five interactions registered to a tower near the location where the crimes occurred.

## II. DISCUSSION

### A. *Sufficient Evidence of Carjacking and Robbery.*

Following the close of the People's case, defendant moved for judgment of acquittal (§ 1118.1[7]) on the grounds of insufficient evidence to support the charges and firearm allegation. The defense argued Ahmed "testified [defendant] was not the perpetrator of the carjacking." The prosecutor disagreed, asserting Ahmed said, "'I can't identify who that person is.'"

In denying the section 1118.1 motion, the trial court reasoned Ahmed's testimony "clearly" presented a carjacking, a robbery, and the use of a gun. The court found "that evidence is corroborated by the statements of Ms. Black, who initially denies but eventually describes with sufficient particularity the fact that a robbery happened, that she was involved with it, that James Wilson [(J Dub)] was involved with it, and the defendant was involved with it—and that a gun was used." Also, the court pointed to (1) defendant's *Mirandized* statements, which describe "having seen the robbery occur by three people, excluding himself[ and identifying] a gun . . . used by a white male with a hood," and (2) the videography evidence that shows defendant, Black, and Wilson (J Dub) at a restaurant and CVS, and in possession of property taken from Ahmed's vehicle. While Black is an accomplice, her testimony was corroborated by defendant's

---

[7] Section 1118.1 provides that in a criminal jury trial, "the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged . . . if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

admissions (he was at the scene of the crimes and drove the stolen Jeep), along with video evidence from the restaurant and CVS.

On appeal, defendant contends (a) the trial court erred in denying his section 1118.1 motion, and (b) the identification evidence was insufficient to sustain his convictions for carjacking and robbery. We dispose of the two contentions together since the standard of review for the dismissal motion is similar to the standard of review for the claim of insufficiency of the evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019.) "When reviewing a trial court's denial of a section 1118.1 motion for acquittal, we apply the substantial evidence standard of review. [Citation.] Likewise, when a conviction is challenged on appeal for insufficient evidence to support it, we apply the substantial evidence standard of review. [Citations.] In applying that substantial evidence standard, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the conviction. [Citations.] Substantial evidence is evidence that is reasonable, credible, and of solid value such that a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. [Citation.]" (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 41-42; see *People v. Rodriquez* (1999) 20 Cal.4th 1, 11 [federal standard of review is the same].) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

7

According to defendant, his conviction "cannot be sustained based on [Ahmed's] testimony." Arguably, if the only evidence presented to the jury was Ahmed's testimony, we would agree. However, Ahmed's testimony was not the only evidence; Black confessed to the carjacking and robbery with help from defendant and J Dub. Nonetheless, defendant asserts that Black, the only witness who identified him, is an accomplice whose testimony was not corroborated. We disagree.

There is no dispute that Black qualifies as an accomplice, and the jury was so instructed.[8] "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) Section 1111 has been interpreted to "require 'evidence tending to connect defendant with the crimes

---

[8] The jury was instructed with CALCRIM No. 335, which, in relevant part, provides: "You may not convict the defendant of Carjacking . . . or of Robbery . . . based on the statement or testimony of an accomplice alone. You may use a statement or testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

"without aid or assistance from the testimony of'" the accomplice. [Citation.] . . .

[E]vidence corroborating accomplice testimony '"need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and "'may be circumstantial or slight and entitled to little consideration when standing alone.''" [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 452 (*Perez*); see *People v. Romero and Self* (2015) 62 Cal.4th 1, 36 ["[T]he corroboration must connect the defendant to the crime *independently* of the accomplice's testimony."].) Also, the corroborating evidence, by itself, need not establish every element of the crime. (*People v. Gomez* (2018) 6 Cal.5th 243, 308.) Rather, "'"[t]he entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration."'" (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.)

Here, in addition to Black's statements, jurors were presented with evidence of her relationship with defendant and J Dub, communication (via cell phone records) between the three on the evening of the carjacking, their acts and conduct (via surveillance videos) after the carjacking, and their possession of items taken from Ahmed's vehicle. However, defendant maintains that his presence at the scene of the carjacking and with Black and J Dub afterward is insufficient to prove that he committed the carjacking and robbery. He analogizes his case to that presented in *People v. Sanford* (2017) 11 Cal.App.5th 84, 94 (*Sanford*).

9

In *Sanford*, six men robbed a jewelry store; they were dressed in dark clothing, wearing hoodies, bandanas, and masks. (*Sanford*, *supra*, 11 Cal.App.5th at p. 86.) Eyewitnesses saw the men depart in two cars, including a black Dodge Magnum; the witnesses provided descriptions and license plate numbers of the vehicles. (*Id*. at pp. 86-88.) Approximately 20 minutes after the robbery, police officers pulled over the black Magnum; there were three occupants, all African-American males: two adults and the 16-year-old defendant, Sanford, who was sitting in the backseat, wearing dark jeans with grey shoes. (*Id*. at pp. 89-90.) Witnesses identified certain items of clothing worn by the robbers but did not recognize any of the three people. There were no weapons, bandanas, masks, or jewelry in the car. (*Id*. at pp. 90-91.) There was no physical evidence that tied Sanford to the jewelry store; DNA recovered from the store did not belong to him, and none of the 17 fingerprints collected from the Magnum were his. (*Id.* at pp. 91-92.) "The only two pieces of evidence indicating that Sanford might have been one of the men at the robbery scene were the fact that he was in the Magnum when it was pulled over and the testimony of the witnesses that the participants in the robbery at the jewelry store were African-American men wearing dark-colored jeans and shoes." (*Id.* at p. 92.) Under those circumstances, the Court of Appeal held that insufficient evidence supported Sanford's robbery conviction. (*Id.* at pp. 92, 95.)

Applying the holding in *Sanford* to this case, defendant argues reversal is necessary because (1) Ahmed never identified him as one of the carjackers (at the preliminary hearing, at trial, or in a six-pack of photos), (2) Black had a motive to lie

10

about his involvement (namely to reduce her own culpability), (3) his presence in Ahmed's Jeep is irrelevant, (4) he has a tattoo on the left side of his face and no acne scarring (Ahmed testified the carjacker has acne scarring and a tattoo on the right temple), (5) Little Billy has a tattoo on his face, (6) Ahmed did not observe tattoos on the carjacker's hands (defendant has visible tattoos on his hands), and (7) the jury expressed issues regarding the discrepancy between Ahmed's description of the carjacker and defendant's physical appearance. Because we consider the record as a whole, we disagree with defendant that this case bears any similarity to *Sanford* where defendant's conviction was primarily based on the presence of three men in the getaway car that was pulled over approximately 20 minutes after the robbery. Instead, this case is similar to *Perez*, *supra*, 4 Cal.5th 421.

In *Perez*, the defendant challenged his conviction of murder, robbery, and vehicle theft on the grounds there was insufficient evidence corroborating the testimony of an accomplice. (*Perez*, *supra*, 4 Cal.5th at pp. 428, 452.) Rejecting the defendant's argument, the California Supreme Court noted that eyewitnesses "placed Perez and the two other men near the scene of the crime during the timeframe" of the murder, witnesses testified Perez tried to sell them some of the stolen property just after the murder, and "[t]he timeframe of the crime was also confirmed by the evidence of when and where the stolen SUV was abandoned, as well as when and where the men checked into a motel near the site of the abandoned vehicle." (*Id*. at p. 453.) The court acknowledged that "this array of evidence did not 'corroborate every fact to which the accomplice

11

testifie[d]' and could perhaps be characterized as 'circumstantial or slight and entitled to little consideration when standing alone,'" but concluded that it was sufficient because "it tends to connect [the defendant] to much of the narrative established by [the accomplice's] testimony." (*Ibid*.)

Here, the entire conduct of defendant, Black, and J Dub, and their relationship, acts, and conduct, sufficiently corroborate Black's statements. She confessed to carjacking and robbing Ahmed, she and defendant admitted they were in a relationship, defendant admitted to being present at the crime scene, cell phone records confirm the communication between the three on the evening of the carjacking, surveillance videos recorded defendant in possession of items taken from Ahmed's vehicle, and defendant's conduct (lying to investigators) suggested guilt. This evidence, some of which may be circumstantial or slight, connects defendant to the narrative established by Black, as well as Ahmed. Thus, sufficient evidence supports defendant's convictions.

*B. Motion to Substitute Counsel.*

Defendant contends the trial court prejudicially erred in failing to conduct a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), based on his letter expressing concerns regarding defense counsel's performance.

On March 2, 2022, the trial court received two letters from defendant who complained about his appointed counsel, Roger Sheaks. In the second letter, defendant stated, "I will most likely be requesting a *Marsden* hearing." No action was taken; however, copies of the letters were furnished to counsel. On June 21, 2022, Mr. Sheaks

12

declared a conflict, and Marty Miller was appointed.  Trial began on June 15, 2023, and verdicts were rendered on June 29, 2023.

On July 13, 2023, defendant sent a note to the trial court criticizing his counsel's representation.  The note, in relevant part, provides, "First, I would like to point out the obvious fact that my attorney of record . . . did not do a fair job of representing me.  For one he did not cross-examine the victim . . . or any witness, nor did he call any of my witnesses!  [Defense counsel] was in too [*sic*] getting on to his next case.  [¶]  In fact [defense counsel] was too busy texting or messaging to another clients [*sic*] wife while we sat at the defense table!  [¶]  [Defense counsel] did an unfair job of defending me!  He refused to bring up the fact that I do have, and have always had[,] mental health problems.  [¶]  My point is I need help[,] not jail or prison.[9]  A program, Salvation Army or the Delancey Street Foundation!  Or I need to be back in a mental health hospital!  Please your Honor, I am asking for help!  [¶]  I am literally throwing myself at your feet and begging you for mercy!  [¶]  Seriously want to be a better man and be there for my family and change my life!  I am a drug addict[10] and jail and prison will not help especially since prison is full of drugs!  [¶]  So I am begging you for help please?  Thank you for your time and consideration. . . . [¶] . . . [¶]  P.S.  [Defense counsel] does not

---

**9**  In the margin, defendant wrote:  "And I KEPT LETTING [DEFENSE COUNSEL] KNOW THAT I DID NOT UNDERSTAND WHAT WAS GOING ON!"

**10**  In the margin, defendant added, "Recovering Drug Addict."

13

want to wait for probation to see me!  Please help me!"[11]  The court received the letter at 2:00 p.m. on July 19, 2023.

On August 11, 2023, the trial court ordered the letter be provided to counsel, but noted, "No further action to be taken except on party's initiative."  Subsequently, defense counsel filed a sentencing memorandum on defendant's behalf and represented him at the hearing.  Defendant never mentioned the letter nor requested new counsel.

In a *Marsden* motion, a defendant seeks appointment of a new attorney based on the claim that appointed counsel is incompetent or ineffective.  (*Marsden*, *supra*, 2 Cal.3d at pp. 123-126.)  Although no formal or specific language is necessary to ask for a *Marsden* hearing, the trial court is not obligated to conduct such hearing unless there is "'at least some clear indication by defendant'" that he or she wants substitute counsel.  (*People v. Sanchez* (2011) 53 Cal.4th 80, 89-90.)  "Equivocal statements of dissatisfaction do not suffice."  (*People v. Wilson* (2023) 14 Cal.5th 839, 864.)

Here, the July 13, 2023, letter provided no clear indication defendant wanted a substitute attorney, nor did he request one.  Rather, it expressed defendant's dissatisfaction with counsel's representation[12] in order to introduce his (defendant's)

---

[11]  In the top margin, defendant added, "P.S.S.  PLUS I WAS OFF OF ALL MY PSYCH MEDS!"

[12]  Although defendant asserts he "wanted counsel to present [his] history of mental health issues, which was not offered at trial or as mitigating evidence at the sentencing hearing," he admits that at the sentencing hearing, his "counsel introduced numerous certificates of courses and programs [defendant] had completed during his two years in custody for drug rehabilitation, reforming criminal behavior, and reintegration as mitigating evidence, as well as his acceptance into the Delancy Street Program which revealed his willingness and commitment to turning his life around."

"mental health problems" and convey a plea for mercy; defendant stated that his "point is [he] need[s] help not jail or prison." More importantly, when defense counsel continued to represent defendant at the sentencing hearing, defendant raised no objection. Based on this record, we discern no basis for construing defendant's letter as a request to substitute counsel. Defendant's reliance on *People v. Armijo* (2017) 10 Cal.App.5th 1171, 1183-1184, is misplaced. As the People point out, in that case, the defendant's letter specifically "asked the trial court to replace [defense counsel] with another court-appointed counsel." (*Id.* at pp. 1176-1177, 1179-1180.) The letter before this court makes no such request. Accordingly, the trial court did not prejudicially err in failing to conduct a *Marsden* hearing.

### *C.  Selection of MidTerm.*

At sentencing, the prosecutor argued, "there were not factors in aggravation that were pled and proven . . . so . . . we are limited to the middle term, and the two charges appear to be [section] 654 of each other, so the People would be requesting the mid term of five years on the [carjacking]." The same sentence was recommended by the probation officer. In response, defense counsel informed the trial court that defendant had taken and completed courses toward substance abuse treatment, and was accepted into the Delancey Street program. Counsel asked that the court "consider a suspended sentence to allow [defendant] to complete a substance abuse treatment program." Via the sentencing memorandum, counsel requested the midterm (five years) for the carjacking, but stay one-third the midterm for the robbery, then suspend imposition of that sentence

15

to grant 24 months of formal probation, with 365 days of county jail, and substance abuse treatment.  Alternatively, the defense requested the low term (three years) for carjacking, and an imposed, but stayed, sentence of one-third the midterm for robbery.  There was no discussion of the jury's rejection of the gun use allegation or that Ahmed was not particularly vulnerable.

After considering the factors listed in California Rules of Court, rule 4.414,[13] the trial court concluded, "the presumption of ineligibility has not been overcome and . . . the vast majority [of the factors] point to a denial of probation."  In selecting the appropriate term, the court agreed with the probation officer's and prosecutor's recommendations, stating, "I am referring to the Rules of Court 4.421, specifically (a), factors relating to the crime:  The crime involved a threat of great bodily harm to the complaining witness.· As described by the witness's testimony, he felt a gun to his head, and the threat as well.  [¶] The second factor is the defendant was armed or used a weapon at the time of the commission of the crime.· While the jury did not find beyond a reasonable doubt that to be the case, . . . there's sufficient evidence for me to conclude that this factor is present. [¶]  The next is the victim was particularly vulnerable.  Again, alone in his car in a dark road at night—by two people outside of his car."  The defense raised no objection.  The court continued to discuss both aggravating and mitigating factors[14] and concluded, "I

---

[13]  All further references to rules are to the California Rules of Court.

[14]  "The next factor is whether the defendant induced others to participate or occupied a position of leadership or dominance.· This factor is present.  [¶]  The next factor that is present is the manner in which the crime was carried out indicates planning

16

or sophistication or professionalism.· Not much, but enough to come to an agreement. . . . [I]t is a common street crime.· I find no other factors relating to the crime in aggravation.

"Regarding the factors as to the defendant, the first factor, under [rule] 4.421(b)(1), is that the defendant has engaged in violent conduct that indicates a serious danger to society.  I find that factor to be true.· The threat to the life of the complaining witness and the presence of the gun to his head is a serious danger to society in general and specifically to that individual. [¶]  The next factor is whether the defendant's prior convictions as an adult or sustained petition in juvenile delinquency proceedings are numerous or of increasing seriousness.· That's a factor, which is present.· In this case, the defendant has been involved in the criminal justice system since 1991 through the California Youth Authority.· He graduated as an adult.· Since then, he's suffered seven felonies from 2010 and 2018.· They resulted in three separate trips to state prison, according to the probation report.· And I counted up 11 returns from parole to prison . . . over those three trips all indicating failure on parole. [¶] . . . [T]he . . . crimes in this case are of increasing seriousness as compared to his prior convictions. [¶]  The next factor is whether the defendant has served a prior term in prison or county jail under Section 1170[, subdivision] (h).· In fact, he went to actual state prison, not county jail time, to serve those prison sentences. [¶]· The next factor is whether the defendant was on parole when the crime was committed.· And according to the probation officer, that is true. [¶] The next question is whether the defendant's prior performance on probation, mandatory supervision, post release community supervision, or parole was unsatisfactory.· I think it's fair to say that the answer is yes based upon his criminal history.

"I'm now going to review the circumstances in mitigation.· Rule of Court 4.423, specifically factors relating to the crime.· The first is whether the defendant was a passive participant or played a minor role.· The answer is no. . . . [¶]  The next factor is whether the victim was an initiator or willing participant or aggressor or provoker of the incident.· The answer is no. [¶]  The next factor is whether the crime was committed because of an unusual circumstance such as great provocation that is unlikely to recur.· I found a modicum of validity to this factor.· I'll find it again here, but it is arguable to the contrary. [¶]  The next factor is the defendant participated in the crime under circumstance of coercion or duress where the criminal conduct was partially excusable for some reason, not amounting to a defense.· I do not find this factor to be present. [¶]  The next factor is whether the defendant has no apparent predisposition to do so was induced by others to participate in the crime.· I do not find this factor to be present. [¶]  The next factor . . . is whether the defendant exercised caution to avoid harm to persons or damage to property or the amounts of property taken were deliberately small.· I do not find this present. [¶]· The next factor is . . . whether the defendant believed he had a claim of right to the property taken.  There's no evidence to support this factor either. [¶]· The next factor is whether the defendant was motivated by a desire to provide necessities for his family or self.· There's no evidence this factor is present. [¶]  The next factor is whether the defendant suffered from repeated continuous physical, sexual, or

17

am compelled to select the middle term in this matter of five years [for carjacking, and] impos[e] the mid term of three years [for robbery, section] 654, permanently stayed as a result."

In general, trial courts have broad sentencing discretion (*People v. Sandoval* (2007) 41 Cal.4th 825, 844 (*Sandoval*); however, recent amendments to sentencing laws have provided guidance on how that discretion may be exercised. "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, *the court shall*, in its sound discretion, *order imposition of a sentence not to exceed the middle term. . . .*" (§ 1170, subd. (b)(1), italics added; see *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [effective January 1, 2022, "Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170, subdivision (b), making the middle term of imprisonment the presumptive sentence"].) Nonetheless, if mitigating factors support it, the court may impose the low term. (§ 1170, subd. (b)(7).[15]) On appeal, we review a sentencing

_____

psychological abuse inflicted by the victim of the crime.· I find this factor . . . not even applicable. [¶] And the next factor is if the firearm was used in the commission of the offense, was it unloaded or inoperable. There's no evidence that this is present either.
    "Factors 4.423, subdivision (b) . . . none of these factors related to the defendant are present, either in the record or in today's hearing."
    [15] Section 1170, subdivision (b), in relevant part, provides: "(6) Notwithstanding paragraph (1), and *unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice*, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) . . . psychological, physical, or childhood trauma . . . . [¶] (B) . . . youth . . . . [¶] (C) . . . the person is or was a victim of intimate partner violence or human trafficking. [¶] (7) *Paragraph (6) does not preclude the court from imposing the lower term even if there is no evidence of those circumstances listed in paragraph (6) present*." (§ 1170, subd. (b), italics added.)

decision for abuse of discretion. (*Sandoval*, at p. 847.) A court abuses its discretion if it relies on circumstances irrelevant to the decision or that otherwise constitute an improper basis for it. (*Ibid*.)

Emphasizing subdivision (b)(7) of section 1170, defendant contends the trial court abused its discretion by imposing the midterm sentence for carjacking. Specifically, he argues the court improperly considered two aggravating circumstances when it declined to impose the low term. These circumstances are: (1) defendant used a firearm (the jury rejected the gun use allegation), and (2) Ahmed was particularly vulnerable. The People assert defendant forfeited any issue regarding the trial court's imposition of the midterm by failing to object to the court's reliance on the facts that he used a firearm, and that Ahmed was particularly vulnerable. "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.) Nonetheless, since defendant requested the low term, and the law governing a trial court's sentencing discretion is still developing, we choose to address the merits of his contention out of an abundance of caution and judicial economy.

Defendant argues that since "the jury determined beyond a reasonable doubt the gun use allegation was not true for the carjacking, the court was barred from considering that factor at sentencing." He acknowledges prior decisions have held otherwise; however, he submits the law on this point is evolving. (*People v. Arnold* (2023) 93 Cal.App.5th 376, 385-387 (*Arnold*) [trial court could not find the petitioner was the actual

19

killer in a stabbing since the jury previously found not true that he personally used a knife].)  Defendant's reliance on *Arnold* is misplaced.

As the People point out, *Arnold* involved a petition for vacatur of a murder conviction under section 1172.6, "where [the trial court] determined '*beyond a reasonable doubt* that [the defendant] stabbed the victim," in direct contravention of a previous jury finding, under the same standard, that he did not.  (*Arnold*, *supra*, 93 Cal.App.5th at p. 387, italics added.)  Since the trial court considered the "exact same issue" that had already been settled by the jury, collateral estoppel applied.  (*Ibid.*)  In contrast, the trial court applies a lower standard of proof (preponderance of the evidence) at sentencing than the standard of proof (beyond a reasonable doubt) applied by the jury. (*People v. Carter* (2019) 34 Cal.App.5th 831, 845 [jury's finding the prosecution failed to prove a given fact beyond a reasonable doubt is not inconsistent with trial court's finding the prosecution did prove the same fact by a preponderance of the evidence]; *People v. Towne* (2008) 44 Cal.4th 63, 87-88 ["an acquittal merely establishes the existence of a reasonable doubt as to guilt.  Unless specific findings are made, 'the jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict . . . .'"].)  Accordingly, the trial court could, and did, find that defendant used a firearm despite the jury's finding to the contrary.

Notwithstanding the use of a firearm aggravating factor, the trial court also based its midterm sentence on the aggravating circumstance that Ahmed was particularly vulnerable.  """[A] 'particularly vulnerable' victim is one who is vulnerable 'in a special

20

or unusual degree, to an extent greater than in other cases.'"' [Citation.] "'"Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.'"' [Citation.] A victim is considered particularly vulnerable 'where the age or physical characteristics of the victim, or the circumstances under which the crime is committed, make the defendant's act especially contemptible.' [Citation.]" (*People v. Lewis* (2023) 88 Cal.App.5th 1125, 1138.) The "determination as to whether '[t]he victim was particularly vulnerable,'" requires "an imprecise quantitative or comparative evaluation of the facts." (*Sandoval*, *supra*, 41 Cal.4th at p. 840.)

Defendant argues Ahmed was not "unusually vulnerable" because he was "an able-bodied adult male of normal intelligence[,] . . . he was not extremely old or a youth, and the crime did not occur in the middle of the night." While the personal characteristics of Ahmed do not make him particularly vulnerable, the setting and circumstances of the crime do. Black, a trusted friend, lured Ahmed to a dark, unincorporated area at night where he was ambushed by no less than three people. He was ordered out of his vehicle. His vehicle, cell phone, and all of his cash were taken. Under these circumstances, the trial court could, and did, find the victim was defenseless, unguarded, unprotected, accessible, and assailable and thus particularly vulnerable. (See *People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1007; *People v. Eades* (1979) 95 Cal.App.3d 688, 690 [even a police officer may be a particularly vulnerable victim in certain situations].)

In short, the trial court did not abuse its discretion in considering either of the challenged aggravating factors.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

RAPHAEL
J.

MENETREZ
J.